J-A24041-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: W.A.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1348 EDA 2022 |

Appeal from the Order Entered April 20, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000103-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: W.A.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1349 EDA 2022 |

Appeal from the Decree Entered April 20, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000184-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: C.M.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1350 EDA 2022 |

Appeal from the Order Entered April 20, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000164-2020

| IN THE INTEREST OF: C.M.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: S.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1351 EDA 2022 |

Appeal from the Decree Entered April 20, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000183-2021

| IN THE INTEREST OF: A.C.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1352 EDA 2022 |

Appeal from the Order Entered April 20, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000212-2020

| IN THE INTEREST OF: A.C.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1353 EDA 2022 |

Appeal from the Decree Entered April 20, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000182-2021

BEFORE:  PANELLA, P.J., BENDER, P.J.E., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:                              **FILED JANUARY 6, 2023**

S.C. ("Mother") appeals from the decrees granting the petitions filed by the Philadelphia Department of Human Services ("DHS") to involuntarily terminate her parental rights to her sons, W.A.C. (born June 2015), C.M.C. (born May 2016), and A.C.C. (born January 2019) (collectively, "Children").[1] Mother also appeals from the orders in Children's dependency cases changing their permanency goals from reunification to adoption. After careful review, we affirm the termination decrees and dismiss the appeals from the goal change orders as moot.

The relevant facts and procedural history are as follows. On January 19, 2020, DHS received a Child Protective Services ("CPS") report alleging that A.C.C., who was one year old at the time, presented at St. Christopher's Hospital ("the hospital") because he was having difficulty breathing. *See* N.T., 3/1/22, at 21-25; *see also* DHS Exhibit 16, 1/19/20, at 3-4.[2] The report, ultimately deemed founded, alleged that A.C.C. had been malnourished: he was the size of an infant, and his bones were visible beneath his skin. *See* DHS Exhibit 16, 1/19/20; N.T. 12/8/20, at 108-09. The report stated that

---

[1] On March 1, 2022, the trial court terminated the parental rights of A.B., the putative father of W.A.C. and C.M.C. On the same date, the trial court terminated the parental rights of any unknown father for C.M.C. Subsequently, on April 20, 2022, the trial court terminated the parental rights of T.G., the putative father of A.C.C., and any unknown father. No putative father or unknown father filed an appeal or participated in the instant appeals.

[2] At the goal change/termination hearing, the parties stipulated to the admission of DHS Exhibits 3-16. *See* N.T., 3/1/22, at 14-18.

A.C.C.'s condition was deemed a near fatality and alleged that Mother's and Grandmother's neglect and abuse had caused his condition. *See* DHS Exhibit 16, at 2.

DHS investigative worker Shaylyn Kreider ("Ms. Kreider") saw A.C.C. in the hospital and stated that he "appeared to . . . be malnourished. I could observe his ribs. He also had bed sores on his body. And his legs were contorted and stuck together." N.T., 3/1/22, at 24-25. Ms. Kreider testified that A.C.C. weighed nine pounds at birth, but only eight pounds when he arrived at the hospital, where doctors determined he could not walk or crawl. *See id*. at 28-30. A.C.C. was hospitalized for more than two months, until March 31, 2020. *See id*. at 29. Because of A.C.C.'s suspected abuse, the hospital requested that A.C.C.'s siblings, C.M.C. and W.A.C., be brought for physical screenings. *See* N.T., 12/8/20, at 46-47.

On January 20, 2020, DHS received a CPS report, later determined to be founded, that C.M.C., then three years old, had been admitted to the hospital, and that Mother and Grandmother had abused and neglected him. *See* N.T., 12/8/20, at 110; N.T., 3/1/22, at 22; *see also* DHS Exhibit 6, 1/20/20, at 3.

Ms. Kreider observed C.M.C. while he was at the hospital and testified, "He appeared to be malnourished. He was very thin. He also appeared to have cracked skin. And he had a hard time walking." N.T., 3/1/22, at 24. Ms. Kreider also testified that C.M.C. and W.A.C. were initially placed in the

- 4 -

same room at the hospital, but that the nursing staff had moved C.M.C. and fed him separately after staff saw Mother give W.A.C. food meant for C.M.C. *See id*. at 32.

DHS received a General Protective Services ("GPS") report dated January 20, 2020, regarding W.A.C., who was four years old at the time. *See* N.T., 3/1/22, at 21-22; *see also* DHS Exhibit 5, 1/20/20. Ms. Kreider testified that W.A.C. weighed approximately 140 pounds and appeared to be morbidly obese. *See* N.T., 3/1/22, at 24.

DHS visited the hospital on January 21, 2020, and found C.M.C. to be nonverbal, and found that A.C.C. was suffering from bedsores, alopecia, influenza, and Respiratory Syncytial Virus ("RSV"), and had legs that were so contorted that he could not walk. It determined that C.M.C. had not received routine medical care for two-and-one-half years. Mother stated that C.M.C. was verbal, that A.C.C. and C.M.C. ate regularly, and that their low weight could be the result of genetic conditions. *See* N.T., 3/1/22, at 32.

Ms. Kreider, who spoke with Mother during her investigation, stated that Mother did not understand the severity of Children's conditions. *See* N.T., 3/1/22, at 25. Mother also stated that she did not notice anything wrong with A.C.C.'s or C.M.C.'s weight or appearance. *See* N.T., 12/8/20, at 117, 121. Ms. Kreider never found medical evidence to support Mother's contention that Children had a genetic disorder. *See id*. at 32-33.

Ms. Kreider also observed Mother's home, where Children lived with Mother, Grandmother, and two maternal uncles. *See* N.T., 3/1/22, at 31. Ms. Kreider testified that there was no infant formula in the home, despite A.C.C. needing it at the time. *See id.* at 26. She also stated that A.C.C.'s crib was very dirty and that C.M.C.'s Pack 'n' Play portable crib appeared to have an indent "like a body had been there for a while. It was also unkept and dirty." *See id*. It appeared A.C.C. and C.M.C. spent all day and night in their crib and Pack 'n' Play, respectively. *See id*. at 31.

On January 22, 2020, DHS obtained an Order of Protective Custody ("OPC") for W.A.C. and placed him in a foster home. At a shelter care hearing on January 24, 2020, the trial court lifted the OPC, and transferred legal custody of W.A.C. to DHS. The trial court also suspended Mother's visitation until the adjudicatory hearing. *See* Order 1/24/20.

DHS received a CPS report dated January 23, 2020 that alleged that Mother and Grandmother customarily left A.C.C. and C.M.C. in a room alone all day and did not allow them to come out of the room and play with W.A.C. DHS Exhibit 7, 1/23/20, at 3. The report, later determined to be valid, further alleged that Mother and Grandmother called A.C.C. and C.M.C. "[b]astards," "[b]itches," and "[s]tupid," and that Mother only fed A.C.C. and C.M.C. once a day and gave the majority of the food in the house to W.A.C. *See* DHS Exhibit 7, at 3.

On January 31, 2020, DHS obtained an OPC for C.M.C., who was being discharged from the hospital, and placed him in a medical foster care home. After a February 3, 2020 shelter care hearing, the trial court ordered no contact between C.M.C. and Mother, lifted the OPC, and ordered the temporary commitment to stand. *See* Order, 2/3/20.

On March 31, 2020, upon A.C.C.'s discharge from the hospital, DHS obtained an OPC for A.C.C. and placed him in a medical foster care home. After a shelter care hearing on April 1, 2020, the trial court transferred legal custody to DHS and ordered A.C.C.'s temporary commitment to stand. *See* Order, 4/1/20.

In January 2020, February 2020, and April 2020, respectively, DHS filed dependency petitions for Children. While those petitions were pending, DHS established family service plan ("FSP") objectives requiring Mother to (1) maintain employment; (2) sign consents; and (3) obtain appropriate housing. *See* N.T., 3/1/22, at 36.

On March 12, 2020, Mother was arrested and charged with crimes relating to the neglect and abuse of Children. *See* N.T., 3/1/22, at 27; *see also* DHS Exhibits 14-16. The criminal court issued a stay away order keeping Mother and Grandmother from Children. *See* N.T. 3/1/22, at 27.[3]

---

[3] The criminal court's stay-away order remained in effect through the course of the dependency matter. *See* Mother's Brief at 38.

On December 8, 2020, the trial court held an adjudicatory hearing for Children and heard the testimony of Dr. Norrell Atkinson, a child abuse pediatrician and director of the hospital's Child Protection Unit. *See* N.T., 12/8/20, at 28.[4] Dr. Atkinson testified that

> [A.C.C.] was incredibly thin and malnourished. When he came in[,] he was 12 months of age and his weight was, at that point, only about nine -- or eight pounds when he came in. So obviously a[t one] year of age, this is much less than what a child should be weighing. It's more similar to the birth weight of an infant . . . You could see the bones from his ribcage, from his arms, his legs. His skin was essentially hanging loose. He had very minimal fat stores to his body. And he was hooked up to multiple medical devices because . . . he was so sick.

*Id*. at 31. Dr. Atkinson continued:

> He was incredibly sick and ill when he came in. He required aggressive resuscitation with fluids, pressure support, oxygen. His blood sugars were incredibly low. He had seizures. He was gravely ill which caused the hospital to certify this case as a near fatality. . ..

*Id*. at 37.

Dr. Atkinson also examined C.M.C. and W.A.C. during their hospitalizations. Dr. Atkinson testified that C.M.C. "was not as severely ill as [A.C.C.]," but was chronically malnourished. *Id*. at 47. C.M.C. had very little fat; he also had a bony structure, very significant eczema, and developmental

---

[4] At the termination and goal change hearing on March 1, 2022, at the request of Children's guardian *ad litem* ("GAL"), the trial court incorporated into the record the notes of testimony from the December 8, 2020 adjudicatory hearing. *See* N.T., 3/1/22, at 8-9.

delays.  *See id*.  Although about three and one-half years' old, C.M.C. was the size of a thirteen-month-old child.  *See id*. at 48-49.

Dr. Atkinson testified that W.A.C.'s appearance was vastly different from his brothers because he was "morbidly obese" and much larger than appropriate for a four-year-old, which presented the possibility of multiple medical complications.  *See id*. at 60-63.

At the conclusion of the hearing, the trial court adjudicated Children dependent.  The trial court also found under 42 Pa.C.S.A. § 6303, that Mother and Grandmother had abused all three Children, and that aggravated circumstances[5] existed for each child pursuant to 42 Pa.C.S.A. § 6341(c.1).  The trial court ordered that no efforts were to be made to preserve the family and reunify Children with Mother, and it ordered visitation between Mother and Children to remain suspended.  *See* N.T., 12/8/20, 238-43. *see also*

---

[5] Section 6302 of the Juvenile Act provides, in relevant part:

> **"Aggravated circumstances."**  Any of the following circumstances:
>
> * * * *
>
> (2) The child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or **aggravated physical neglect** by the parent.
>
> * * * *

42 Pa.C.S.A. § 6302(2) (emphasis added).

Orders of Adjudication and Disposition, 12/8/20; Aggravated Circumstances Orders, 12/8/20; DHS Exhibits 8-13.[6]

The court held permanency review hearings at regular intervals. On April 1, 2021, DHS filed petitions for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b), and separate petitions to change Children's permanency goals from reunification to adoption. On March 1, 2022, the trial court conducted an evidentiary hearing on the petitions, when Children were ages six, five, and three, respectively. Children were represented by a GAL and separate legal counsel. Mother was represented by counsel and testified. DHS presented the testimony of Ms. Kreider and Rodney Hill, a DHS social worker.[7]

By decrees dated and entered on April 20, 2022, the trial court involuntarily terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). That same day, the court changed

_____

[6] On January 7, 2021, Mother filed notices of appeal regarding these orders. On August 12, 2021, this Court affirmed the trial court's orders. **See In Interest. of W.A.C.**, 262 A.3d 481, 2021 WL 2560049 (Pa. Super. August 12, 2021) (unpublished memorandum).

[7] Following the March 1, 2022 hearing, the trial court held its decision regarding Mother's parental rights in abeyance. The trial court permitted Mother twenty days to sign voluntary relinquishments of her rights to Children. Mother did not sign the forms.

Children's permanency goals to adoption.[8]   Mother filed timely notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).  This Court consolidated Mother's appeals *sua sponte* on June 21, 2022.  The trial court filed a Rule 1925(a) opinion on August 15, 2022.

On appeal, Mother presents the following issues for our review:

1.   Whether the trial court erred and/or abused its discretion when it involuntarily terminated Mother's parental rights, where such determination was not supported by clear and convincing evidence under the Adoption Act[,] 23 P[a].C.S.[A.] § 2511(a)?

2.   Whether [the] trial court erred or abused its discretion by not adequately considering Mother's efforts to correct the conditions which originally brought [Children] into care[?]

3.   Whether the trial court erred and/or abused its discretion when it involuntarily terminated Mother's parental rights without giving primary consideration to the effect that the termination would have on the developmental, physical[,] and emotional needs of [Children] under [s]ection 2511(b) of the Adoption Act?

4.   Whether the trial court erred or abused its discretion by failing to consider the effect on [Children's] bond with Mother of a criminal court's pretrial order denying her contact with [Children] pending the outcome of the criminal case; where the criminal court's pretrial order created a condition beyond Mother's control; where the criminal case was still pending at the time of the termination decree; and where there had been no finding by the dependency trial court that visitation posed a grave threat to [Children]?

_____

[8] On July 15, 2022, Mother entered negotiated guilty pleas to endangering welfare of children and simple assault as to each Child.  **See** Mother's Brief at 20-21.

5.     Whether the [trial court] denied Mother her due process under both the Pennsylvania and United States Constitutions by rushing to termination when her ability to maintain and improve her relationship with [Children] was taken out of her control by the criminal justice system before she had had the opportunity for a fair and speedy trial[?]

6.     Whether the trial court erred and/or abused its discretion by changing . . . [C]hildren's permanency goals to adoption when DHS had not met its burden of proof that such a change would best serve the needs and welfare of each child[?]

Mother's Brief at 11-13 (citations and footnote omitted) (reordered).[9]

Mother asserts in her first and second issues that clear and convincing evidence did not support the involuntary termination of her parental rights, and that the trial court did not adequately consider Mother's attempt to correct the conditions which originally brought Children into care.  As both issues related to the grounds for termination under section 2511(a), we address them together.

We review involuntary termination orders for an abuse of discretion, which requires an error of law or a showing of manifest unreasonableness, partiality, prejudice, bias, or ill-will.  ***See In re Adoption of L.A.K.***, 265 A.3d 580, 591 (Pa. 2021) (citation omitted).  In applying this standard, appellate courts must accept the trial court's findings of fact and credibility determinations if they are supported by the record.  ***See Interest of***

_____

[9] Children's GAL filed a memorandum in support of terminating Mother's parental rights and changing Children's permanency goals to adoption.

*S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021); *see also In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021).

Pennsylvania's Adoption Act governs involuntary termination of parental rights proceedings. *See* 23 Pa.C.S.A. § 2101-2938. Section 2511(a) provides grounds for involuntary termination of parental rights. If the trial court finds clear and convincing evidence supporting the existence of one of the grounds for termination set forth in subsection (a), the court must then consider whether termination would best serve the child under subsection (b). *See In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010).

Here, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). We need only agree with the trial court's decision as to any one of the grounds under subsection 2511(a), along with subsection (b), to affirm a decree terminating parental rights. *See In re B.L.W.*, 843 A.3d 380, 384 (Pa. Super. 2004) (*en banc*). Accordingly, we review the evidence relating to sections 2511(a)(8) and (b), which provide as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> \* \* \* \*
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child

continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * * *

**(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

To satisfy section 2511(a)(8), the petitioner must show three components: (1) that the child has been removed from the care of the parent for at least 12 months; (2) that the conditions which led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child. *In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa. Super. 2018).

Unlike other subsections, section 2511(a)(8) does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the children. *In re M.A.B.*, 166 A.3d 434, 446 (Pa. Super. 2017). The relevant inquiry regarding the second prong of section 2511(a)(8) "is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009).

- 14 -

We observe that sections 2511(a)(8) and (b) both require a court considering a termination petition to assess the needs and welfare of the relevant child or children. However, the needs and welfare analysis required by section 2511(a)(8) is distinct from the needs and welfare analysis required by section 2511(b) and must be addressed separately. *See In re C.L.G*., 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*).

This Court has recognized "that the application of [s]ection [2511](a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to the removal of her children." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). Nevertheless, by allowing for termination when the conditions that led to removal continue to exist after a year,

> the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit eighteen . . . months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

*Id*.

Regarding section 2511(b), we consider whether termination of parental rights will best serve the Children's developmental, physical, and emotional needs and welfare. *See In re Z.P.*, 994 A.2d at 1121. "In this context, the court must take into account whether a bond exists between child and parent,

and whether termination would destroy an existing, necessary and beneficial relationship." *Id*.

The court is not required to use expert testimony when conducting a bonding analysis. Social workers and caseworkers can offer evaluations as well. *See In re Z.P.*, 994 A.2d at 1121. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted). Further,

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.

*In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010). "'Above all else . . . adequate consideration must be given to the needs and welfare of the child. A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights." *In re Z.P.*, 994 A.2d at 1121 (internal citation omitted). "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004).

With respect to section 2511(a), Mother argues that DHS did not prove the elements necessary by clear and convincing evidence. *See* Mother's Brief

at 26. Regarding subsection (a)(8) specifically, Mother contends that DHS did not offer competent evidence that "the conditions and causes [of] any such incapacity, abuse, neglect or refusal cannot or will not be remedied by Mother in that the trial court did not hear competent weighty evidence thereof, which a professional forensic evaluator might have provided." *Id*. at 28 (italics omitted). Mother also argues that she consistently kept DHS apprised of the services she utilized. *See id*. at 29.[10]

The trial court considered Mother's assertions of error and explained that it found the testimony of Ms. Kreider, the DHS investigative worker, and Mr. Hill, the DHS social worker, to be credible, clear, and convincing. *See* Trial Court Opinion, 8/15/22, at 33, 37, 41. Conversely, the trial court found "Mother's testimony . . . was [] incredible and self-serving." *Id*. at 41. The trial court thus determined that the record supports by clear and convincing evidence its decision to terminate Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8). *Id*.

_____

[10] Mother further claims that DHS did not provide evidence that the services or assistance reasonably available and sought by Mother were not likely to remedy the conditions that led to the removal of Children within a reasonable period of time. That assertion is not a part of a section 2511(a)(8) analysis, nor is Mother's contention that the trial court failed to determine that "the conditions and causes or any such incapacity, abuse, neglect or refusal cannot or will not be remedied by Mother", which is relevant to a section 2511(a)(2) analysis, but not a section 2511(a)(8) analysis. *See* 23 Pa.C.S.A. § 2511(a)(2).

Following our review, we discern no abuse of discretion by the trial court in finding that there was clear and convincing evidence for termination under section 2511(a)(8). Regarding the first element of section 2511(a)(8), there is no dispute that Children had been in DHS's care for well over twelve months at the time of the hearing. Concerning the second element, *i.e.*, that the conditions which led to the removal of Children continued to exist, the trial court heard testimony that Children had all suffered from neglect; A.C.C. had suffered a near fatality; and Mother still lived with Grandmother, the other abuser of Children. *See* N.T., 3/1/22, at 36-37, 44, 57, 64-65. Moreover, Dr. Atkinson testified that Mother inaccurately reported what she fed A.C.C. and C.M.C. because they would have been a normal weight if they ate what Mother reported. *See* N.T., 12/8/20, at 38-39, 52. Mr. Hill testified during the termination hearing that although Mother has remained in consistent contact with him, he does not "know if [Mother] understands why [Children are] in care." N.T., 3/1/22, at 37-38.

Mother's own testimony demonstrated that she did not appreciate the gravity of the risk to her children. On direct examination, she was asked the following questions and provided the follow answers:

Q: What is your understanding about what happened to the boys that caused them to be brought into DHS's care?

* * * *

A: That I didn't properly take care of [Children] to the best of [my] abilities.

* * * *

- 18 -

Q: Has your understanding of how [Children] came to be in the condition that they were in two years ago -- has your understanding of that changed over time of how it happened?

A: Yes.

Q: As we sit here today, what exactly do you think is the reason that that occurred?

A: I was just so busy and caught up with working and taking care of the house. I just fully trusted my mother and all her decisions.

*Id*. at 64-65, 71. In addition to blaming her mother, Mother also manifested a lack of understanding of the cause of Children's condition by stating that she participated in a nutrition and cooking course she declared was necessary because "[t]he guys were picky eater[s] and children who overeat." *Id*. at 68. This testimony showed that the conditions that led to a one-year-old child weighing less than his birth weight and a four-year-old child who weighed more than 140 pounds, namely Mother's inability to appreciate the conditions that led to Children's severe neglect, continued to exist.

Regarding the third element of section 2511(a)(8), that termination of Mother's parental rights would best serve the needs and welfare of Children, Ms. Kreider testified that over the first three months Children were in care, W.A.C., who had been morbidly obese, began to lose weight; C.M.C., who was malnourished, gained an appropriate amount of weight and became healthier through occupational therapy; and A.C.C. had gained some weight and was receiving services to address the effects of malnourishment. *See id*. at 33-34. Additionally, Mr. Hill testified that W.A.C. is in a pre-adoptive placement,

looks to his foster parent for love, protection, and support, and does not ask for Mother. *Id*. at 39-40. Similarly, Mr. Hill testified that C.M.C. is in a different pre-adoptive placement, and he looks to his foster parent for all his needs. *See id*. at 41. A.C.C. is also in a different pre-adoptive placement and is bonded with his foster mother who provides for all his needs. *See id*. at 42-43. Mr. Hill also testified that Children are not bonded to Mother, do not ask about her, and would not suffer irreparable harm if her parental rights were terminated. *See id*. at 39-44.

Based on the foregoing testimony, we conclude that the trial court properly exercised its discretion in finding grounds for termination of Mother's parental rights under Section 2511(a)(8). *See In re M.A.B.*, 166 A.3d at 446; *see also In re I.J.*, 972 A.2d at 11.

In her third issue, Mother argues that the trial court's section 2511(b) analysis failed to give primary consideration to Children's needs and welfare.[11]

Following our review, we again discern no abuse by the trial court in concluding that termination of Mother's parental rights was in Children's best interest pursuant to section 2511(b). *See* Trial Court Opinion, 8/15/22, at 41. Mr. Hill, a DHS social worker whom the trial court found credible, testified that Children, who were six, five, and three, respectively, at the time of the

---

[11] Mother also maintains that the trial court abused its discretion in its section 2511(a) analysis. *See* Mother's Brief at 29. As discussed above, the best interest analysis under section 2511(a)(8) is separate from that of section 2511(b).

termination hearing, do not have a bond with Mother, do not ask about her, and would not suffer irreparable harm if her parental rights were terminated. *See* N.T., 3/1/22, at 39-44. The trial court also heard testimony regarding Children's bonds with their respective foster parents. *See id*. Mr. Hill testified that each child is thriving in his placement having formed bonds with their foster parents, and none has had had any issues with their weight since being placed. *See id.* at 39-48. Legal counsel for the Children told the trial court that all three Children want to live forever with their foster parents. *See id*. at 62-63. That evidence established that Children have no bond with Mother and that termination of Mother's parental rights was in the best interest of Children. *See Interest of M.E.*, 283 A.3d 820, 836 (Pa. Super. 2022) (citation omitted) (stating that this Court will credit the factual findings of the trial court which is on the "front lines assessing the credibility of witnesses"); *see also In re K.Z.S.*, 946 A.2d at 762-63 (stating that where there is no evidence of a bond between parent and child, it is reasonable to infer that none exists). Moreover, Mother's alleged progress toward reunification does not demonstrate the existence of a bond with Children, much less one that would be in Children's best interest. *See In re T.S.M.*, 71 A.3d 241, 268-69 (Pa. 2013) (recognizing that some bonds between parent and child are unhealthy and may cause damage if allowed to remain intact). Thus, Mother's third issue merits no relief.

In her fourth issue, Mother claims that the trial court lacked sufficient information to assess section 2511(b) because she was unable to visit Children. Specifically, Mother contends the trial court refused her request to postpone the hearing until her criminal matter was resolved so that visitation could be considered, and that the trial court refused Mother's request for a parenting capacity evaluation. *See* Mother's Brief. at 29-30. Mother further argues that the trial court failed to consider the effect of the criminal court's pretrial order, over which she had no control, improperly analyzed the "grave threat" analysis by focusing on the Children's potential future testimony rather than the grave threat she posed to them, and failed to consider whether she posed a grave threat in the context of how visits would affect Children individually. *See id*. at 30-39.

Visitation is only properly denied where it poses a grave threat to the Child, a standard met where the parent demonstrates a severe mental or moral deficiency that constitutes a grave threat to the child. ***See In re C.J.***, 729 A.2d 89, 95 (Pa. Super. 1999).

Mother presents no law requiring a trial court to hold in abeyance an involuntary termination decision pending resolution of related criminal matters, and this Court is not aware of any such holding. As in this case, the resolution of criminal matters can consume multiple years, and Children's needs and welfare are paramount in a section 2511(b) analysis. ***See In re Z.P.***, 994 A.2d at 1121. We perceive no error in the failure to grant relief on

Mother's claim that the pendency of the criminal proceedings required that the termination proceeding be halted.

To the extent Mother claims that the trial court misapplied the grave threat analysis in denying her visitation, Mother supports her claim by citing portions of hearing transcripts on February 6, 2020, and February 25, 2020, on the dependency docket. *See* Mother's Brief at 30-33, 34-37. Those transcripts were never entered into evidence on the adoption dockets, nor did Mother move to supplement the record with them. Thus, we may not consider them. *See In re S.S.*, 252 A.3d 681, 688 (Pa. Super. 2021).

Were we free to consider Mother's allegation – unsupported by record evidence – that the trial court should have focused its February 2020 grave threat analysis on the risk to Children rather than to their later ability to testify, we might agree that the trial court's initial focus on Children's future testimony was misplaced. Nevertheless, at a later hearing, the trial court found that aggravated circumstances existed regarding Mother's abuse and neglect of Children. *See* N.T., 12/8/20, at 241. In its opinion, the trial court cited the Children's dangerous medical conditions at the time they came into care, and "the deplorable condition of their beds, food, lack of heating, and overall distressing, dangerous care given by [Mother]." *See* Trial Court Opinion, 8/15/22, at 47.

- 23 -

Based on these findings, we would not conclude the trial court abused its discretion in finding that Mother, who had malnourished one[12] child and grossly overfed another to the point of morbid obesity, posed a grave threat to Children.[13]

In her fifth issue, Mother argues that she was deprived of her due process of law under the Fourteenth Amendment to the United States Constitution by the "extraordinary delays" in the administration of justice throughout the dependency process. *See* Mother's Brief at 45-48. Mother failed to assert this alleged error in her concise statements of errors complained of on appeal, and the trial court did not address it. The claim is, thus, unreviewable. *See In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa. Super.

---

[12] A.C.C. was not then under the court's jurisdiction. *See* Mother's Brief at 31.

[13] Additionally, the criminal court issued its stay-away order on March 12, 2020, less than two months after the trial court's stay away order. *See* N.T., 12/8/20, at 242 (trial court stating that the criminal court has issued a stay-away order against Mother and Grandmother, and that its stay-away order "just piggyback[s] on top of that."). There were thus less than two months in which the trial court's stay-away order was the only bar to Mother's visitation, and that period of time began immediately after two of the Children were hospitalized with malnutrition attributable to Mother, which is probative of a grave threat. Additionally, even during that less than two months period, the trial court did not absolutely preclude visitation as to the two children who were then before it: the court ordered supervised visits with C.M.C., and allowed for the possibility of visits with W.A.C. *See* Mother's Brief at 30-33. We decline to conclude that the trial court abused its discretion in determining that Mother presented a grave threat to Children in the less than two months when the trial court's stay-away order was the only bar to visitation.

2017) ("[I]t is well-settled that issues not included in an appellant's statement of questions involved and concise statement of errors complained of on appeal are waived.").

In her sixth and final issue, Mother argues that the trial court abused its discretion by changing Children's permanency goals from reunification to adoption where DHS failed to meet its burden of proof that goal changes would best suit Children's needs and welfare.  **See** Mother's Brief at 44-45.  Given our disposition affirming the termination decrees, Mother's appeals from the goal change orders are moot.  Therefore, we dismiss her appeals from the goal change orders.  **See In the Interest of D.R.-W.**, 227 A.3d 905, 917 (Pa. Super. 2020) ("An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect.") (citation omitted).

Termination decrees affirmed.  Appeals from the goal change orders dismissed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>1/6/2023</u>

- 25 -